Donald J. Kula, Bar No. 144342
DKula@perkinscoie.com
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Erwin Chemerinsky, Esq.,
EChemerinsky@law.uci.edu
UC IRVINE SCHOOL OF LAW
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000
Telephone: 949.824.8814
Facsimile: 949.824.7336

Malcolm Segal, Bar No. 075481
MSegal@segal-pc.com
SEGAL & ASSOCIATES, PC
400 Capitol Mall, Suite 2550
Sacramento, CA 95814
Telephone: 916.441.0886
Facsimile: 916.475.1231

Attorneys for Plaintiff Gilbert P. Hyatt

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

GILBERT P. HYATT,

Plaintiff,

v.

JOHN CHIANG, JEROME E. HORTON, AND MICHAEL COHEN, CALIFORNIA FRANCHISE TAX BOARD MEMBERS; BETTY T. YEE, GEORGE RUNNER, MICHELLE STEEL, JEROME E. HORTON, AND JOHN CHIANG, CALIFORNIA STATE BOARD OF EQUALIZATION MEMBERS; AND DOES 1 THROUGH 20,

Defendants.

Case No.

**COMPLAINT FOR INJUNCTIVE RELIEF UNDER 42 U.S.C. § 1983 BASED ON:**

**1. VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION; AND**

**2. VIOLATIONS OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**

Gilbert P. Hyatt ("Plaintiff" or "Hyatt") files this Complaint in the United States District Court for the Eastern District of California ("Court") seeking injunctive relief against John Chiang, Jerome E. Horton, and Michael Cohen, in their official capacities as California Franchise Tax Board members, and Betty T. Yee, George Runner, Michelle Steel, Jerome E. Horton, and John Chiang, in their official capacities as California State Board of Equalization members, (collectively "Defendants" or "Defendant government actors"), and respectfully alleges and states as follows:

## NATURE OF ACTION

1. This is a civil action under 42 U.S.C § 1983 seeking injunctive relief against the Defendant government actors to prevent further acts by Defendants, under the color of law, depriving Plaintiff of rights secured by the United States Constitution under both the Due Process and the Equal Protection Clauses, respectively, of the Fourteenth Amendment. The injunction sought would enjoin and put an end to a pending state government administrative process that has now taken *over 20 years*, is not complete, and for which the Plaintiff Hyatt can no longer receive a full and fair adjudication on the merits due to the extreme passage of time and resulting loss of material evidence.

2. Specifically, more than 22 years ago in 1991 Hyatt moved from California to Nevada and more than 20 years ago *in 1993* the California Franchise Tax Board (the "FTB") commenced an audit and an investigation of Hyatt to determine whether he owed additional state income tax for the *1991 tax year*. As of today, this administrative process is still ongoing. Similarly, a second audit and investigation commenced by the FTB in 1996 and directed at Hyatt for the *1992 tax year* continues and is also in administrative limbo.

3. For the last six years, this administrative process has been stalled in an administrative appeal before the California State Board of Equalization (the "SBE"). There is no functional independence between the FTB and the SBE as two

of the five board members of the SBE also constitute two of the three board members of the FTB.

4. The *20 year delay* and failure and refusal to complete the administrative process has irreparably prejudiced Hyatt and is so egregious that it now denies Hyatt his right to due process under the law. Specifically, because of the *20 year delay* Hyatt can no longer obtain a fair and full adjudication of whether he owes state taxes to California. During this time, material witnesses have passed away, memories of witnesses have faded, and documents relevant and important to Hyatt are no longer available. Moreover, during this time the FTB has changed and added theories to tax Hyatt and asserted new "facts" in the administrative process for which it has a presumption of correctness in its favor, while Hyatt has the burden to rebut the FTB's asserted new "facts" more than 22 years after-the-fact. Without this Court's grant of the relief that Hyatt seeks, the egregious and unlawful state government conduct that has irreparably prejudiced Hyatt will continue unabated in violation of Hyatt's due process rights as Hyatt may be assessed taxes, penalties and interest for the 1991 and 1992 tax years — a period from more than 22 years ago — but due to this long delay Hyatt has no plain, speedy and efficient remedy in state court in which he can obtain a full and fair hearing challenging any final administrative action and adjudicating whether any taxes, penalties or interest are actually owed for those years.

5. Further, Hyatt has been singled out by these government actors who in bad faith have engaged in conduct, or failed to stop conduct, unlike that directed at any other citizen and in direct violation of Hyatt's right to equal protection under the law. Without this Court's grant of the relief that Hyatt seeks, the FTB's 20 plus year vendetta to "get" Hyatt will continue indefinitely and unabated in violation of Hyatt's equal protection rights.

6. The named Defendant government actors have allowed this conduct to occur, despite their responsibility to bring the administrative process to an end. By

the FTB's own internal guidelines, audits are to be completed by the FTB in two years. Then an administrative protest filed by a taxpayer challenging the audit results is to be completed in 1 to 2 years. In this case the FTB took over 14 years to complete the audit and protest, and the FTB is now six years and counting into administrative appeal, being heard by the SBE. The FTB has done everything in its power to delay and extend this appeal preventing its conclusion such that now Hyatt has been irreparably prejudiced by this delay of over 20 years.

7. After more than 20 years of waiting for the FTB and the SBE to complete this administrative process, Hyatt has no plain, speedy and efficient remedy under California state law that will provide him a full and fair hearing on whether state taxes are owed, thereby negating any prohibition of federal court injunctive relief against Defendants and differentiating Hyatt's case from any prior case that has sought this type of injunctive relief. The appropriate remedy therefore is to enjoin the individual Defendant government actors from continuing to investigate and audit or otherwise proceed with the administrative process against Mr. Hyatt for the 1991 and 1992 tax years, or any subsequent years based on the claims and the assertions the FTB has made in the current pending administrative proceeding for which relief is sought.

8. Defendants acting in their official capacities, have threatened, and continue to threaten, Hyatt with ***$55 million plus*** of unconstitutional exactions, specifically the assessment of state income taxes, penalties, and more than 22 years of interest on the assessed taxes and penalties, for tax years 1991 and 1992. Without the injunctive relief sought by Hyatt, and specifically because of the loss of evidence that has occurred during the extreme delay in completing the administrative process, Hyatt will suffer irreversible and irreparable harm including continued and ongoing deprivations of his federal constitutional rights if the FTB is now allowed to assess and collect state taxes, penalties, and interest thereon, despite the 20 plus year delay in completing the administrative process.

## THE PARTIES

9. Hyatt is a resident of the State of Nevada.

10. In 1990, while residing in California, the United States Patent Office issued to Hyatt a patent for the single chip microcomputer that spawned the personal computer revolution. At least one publication referred to him as the 20th Century's Thomas Edison.

11. Hyatt permanently moved from California to Nevada in September 1991. He has continuously resided in Nevada since September 1991, he still resides in Nevada to this day more than 22 years later, and he intends to reside in Nevada for the rest of his life. The FTB asserts, however, that Hyatt became a Nevada resident on April 3, 1992. Thus, the disputed residency period covers a mere six month period.

12. The FTB, by and through Defendants John Chiang, Jerome E. Horton, and Michael Cohen, acting in their official capacities as FTB Board members, is the California state agency responsible for administering and enforcing California's personal income tax laws, including the taxation of individuals on the basis of their alleged residency in California.

13. The SBE, by and through Defendants Betty T. Yee, George Runner, Michelle Steel, Jerome E. Horton, and John Chiang, in their official capacities as SBE Board members, is the California state agency responsible for hearing and deciding administrative appeals filed by taxpayers (including individuals alleged by the FTB to owe taxes, and therefore collectively referred to herein as "taxpayers" whether or not taxes are actually owing to the FTB) who have been audited and assessed taxes by the FTB. This includes individuals assessed taxes on the basis of their alleged residency in California or on the basis of alleged California "source" income from rights in intellectual property that was allegedly sourced in California.

14. Upon completion of the administrative appeal to the SBE and denial or partial denial of the appeal, a taxpayer assessed taxes, penalties, and/or fines on the

basis of alleged residency in California for the year(s) in question may file a declaratory relief action in California Superior Court seeking a *de novo* determination as to whether the assessed taxes are owed to the State of California *without having to pay the assessed taxes, penalties and interest*. (*See* Cal. Rev. & Tax Code § 19381; Cal. Civ. Proc. Code § 1060.5.)

15. On the other hand, upon completion of the administrative appeal to the SBE and denial or partial denial of the appeal, a taxpayer assessed taxes, penalties, and/or fines on the basis of alleged California "source" income, or any basis other than residence, may challenge the assessment in California Superior Court but must pay the outstanding assessment and seek a refund by filing an action for a refund in California Superior Court.

16. But as set forth in detail below, the manner in which Defendants have acted over the last 20 plus years has deprived Hyatt of his due process rights and equal protection rights under the United States Constitution if Defendants are allowed to continue to assess and collect, or threaten to assess and collect, state income taxes from Hyatt for the 1991 and 1992 tax years. The 20 plus year process has now already reached the point that Hyatt cannot obtain a full and fair *de novo* trial in California Superior Court on the issue of his residency or any other basis for which the FTB seeks to tax Hyatt for the 1991 and 1992 tax years due to the loss of evidence that has occurred during the 20 year delay in completing the administrative process. Hyatt therefore seeks injunctive relief in this action prohibiting Defendants from continuing to assess or collect, or threaten to assess or collect, state income taxes from Hyatt for the 1991 and 1992 tax years.

## SUMMARY OF CLAIMS AND RELIEF SOUGHT

17. More than *22 years* after Hyatt's move to Nevada and more than *20 years* after the start of the 1991 tax-year audit, the state administrative process stemming from the FTB's audits is still far from complete. The FTB, under the control and direction of Defendants Chiang, Horton, and Cohen, in their official

capacities as FTB board members, continues to investigate, issue subpoenas, take depositions, and otherwise seek evidence against Hyatt, during the appeal before the SBE, for events that occurred between the disputed period of September 1991 and April 1992, some *22 years ago.* In the FTB's never ceasing attempts to assess new taxes, interest and penalties, it has as late as 2013 extended the taxable periods at issue and introduced new theories for its assessments against Hyatt. This is despite California law that mandates that *"[a]s soon as practicable after the return is filed,* the [FTB] shall examine it and shall determine the correct amount of the tax." (*See* Cal. Rev & Tax Code § 19032.)

18. Hyatt as a private citizen lacks adequate recourse in California state forums to bring the FTB's 20 plus year administrative process to a conclusion. Moreover, the FTB, with the SBE's approval, continues to investigate, gather evidence, and prolong the never-ending administrative process and without regard to the requirements of the Constitution.

19. Hyatt is now 76 years old, and every indication is that the FTB — with the SBE's sanction — has been simply waiting for the ultimate prejudice to occur to Hyatt and leave it for his estate to try and fend off the FTB's claims, old and new, without the benefit of Hyatt. In so waiting, Defendants have now caused Hyatt irreparable prejudice in regard to any future *de novo* action Hyatt may be entitled to file in California Superior Court once the administrative process is complete. Without Hyatt, his estate will be even more severely prejudiced in any *de novo* court action that must be brought to challenge the FTB's assessments, whether based on "residency", "source income" or any new theory the FTB attempts to craft. But already at this point it is too late. Too much evidence has already been lost over the last 20 years for there to be a full and fair adjudication of these issues.

20. Hyatt has therefore already been irreparably prejudiced by the 20 plus year delay. The Defendants' abject delay and refusal to conclude this government investigation and administrative process now violates Hyatt's constitutional rights

because he can no longer obtain a fair adjudication on the issue of whether state taxes, penalties or interest are owed from over *22 years ago*. The administrative process is currently stalled in an administrative appeal before the SBE, under the control and direction of Defendants Yee, Runner, Steel, Horton, and Chiang, in their official capacities as SBE board members. As stated above, Hyatt has a theoretical right under California law *if and when* the State completes its now over *20 year* investigation and administrative process to challenge the State's findings and any assessments against him in California Superior Court in a *de novo* litigation that itself will take many more years to complete. But already due to the passing of material witnesses, the fading of memories, and the unavailability of documentary evidence from more than *22 years ago,* Hyatt has been irreparably prejudiced in his ability to demonstrate in a court of law that no taxes are owed to the State of California for the 1991 and 1992 tax years. Relevant evidence has now been altered and diminished to the point that any assessment against Hyatt for the 1991 and 1992 tax years would amount to an unlawful government taking in violation of the Due Process Clause, including the requirement that Hyatt be afforded a meaningful opportunity to be heard.

21. To put in context the 20 year delay and how it has prejudiced Hyatt, the actual tax assessment the FTB asserted against Hyatt for the 1991 tax year was $1.8 million and for the 1992 tax year was $5.6 million. Both significant sums and vigorously disputed by Hyatt. But now with the passage of time and the FTB's delay and refusal to conclude the administrative process, again with the permission and approval of the SBE, with penalties and interest, the total assessment against Hyatt now sought by the FTB exceeds ***$55 million*** (about 800% more than the tax assessments) and continues to grow with 3% interest compounded daily. Because of the 20 year delay, Hyatt does not have a plain, speedy and efficient remedy in a state forum.

22. Defendants have simply taken too long to complete the investigation

and administrative process, and too much material evidence is no longer available. Prejudicial delay in the extreme has occurred. A fair adjudication within the requirements of the Constitution including the requirements of the Due Process Clause is no longer possible. The investigation and administrative process directed against Hyatt for over *20 years* has been under the unilateral control of the Defendant government actors who have failed and refused to complete the investigation and administrative process against Hyatt in violation of his constitutional rights.

23. The delays in completing the administrative process fall squarely and primarily at the feet of the FTB. While the FTB has at times attempted to assert that Hyatt was a cause of the delays, the FTB was entirely in control of the process from commencement of the first audit in 1993 until the process reached the administrative appeal before the SBE in 2008. It was the FTB that for 11 years (from 1996 until 2007) refused to process and complete the protests thereby preventing Hyatt from filing the administrative appeal until 2008. Further, the FTB has various options it can invoke by statute and regulation if a taxpayer is causing delays. These include failure to furnish penalty assessments and terminating the audit and making assessments. Indeed, terminating the audit and issuing a proposed assessment is the FTB's strongest option where a taxpayer is the cause of delays in the process. The FTB never assessed a failure to furnish penalty against Hyatt during the audit. Nor did the FTB invoke or even threaten to terminate the Hyatt audit. Instead as detailed below the FTB internally put a hold on the protest and disregarded Hyatt's repeated requests to conclude the protests and to issue a final decision in the protests, which stretched to 11 years.

24. Indeed, this long and continuing delay, which is in direct contradiction to FTB internal guidelines, significantly benefits the FTB. First, the assessments incur interest, compounded daily, plus penalties. Second, the FTB's new residency positions, determinations, and proposed tax assessments are presumed to be correct

in the now pending administrative appeal without the FTB having the burden to provide evidence in support of its new residency positions, determinations, and proposed tax assessments. But Hyatt has the burden to provide evidence to rebut the FTB's new residency positions which are presumably correct.

25. The SBE for its part has failed to set a date for a hearing in Hyatt’s case despite years of proceedings. In the pending administrative appeal, the burden will be on Hyatt to prove that the FTB’s residency determinations and proposed tax assessments are erroneous. But material witnesses have passed away, memories of witnesses have faded, and documents relevant and important to Hyatt are no longer available. Thus, the FTB’s long delay coupled with its changes in position by introducing new issues, new assessment theories and new discovery requests against Hyatt is self-serving and beneficial to the FTB. And the FTB is unabashedly adding new positions and new theories 20 years after the proceedings started. Conversely, the long delay significantly prejudices Hyatt by imposing an overwhelming burden on him to rebut the FTB’s alleged new and changing positions and “determinations” with documentary and testimonial evidence more than *22 years* after the disputed period of September 1991 to April 1992. Hyatt, now more than 22 years after the fact, must attempt to rebut these “new” alleged facts and arguments with credible evidence that is in many cases no longer available or accessible.

26. The SBE for its part approvingly allows the FTB to create the uneven and unfair playing field by permitting and approving the unprecedented delay of the administrative process and by permitting the FTB to introduce new assessment theories and investigations against Hyatt with no end in sight. In addition, the SBE lacks any meaningful independence from the FTB and *vice versa*. The FTB’s requests for extensions and further briefing have been freely and routinely granted by the SBE. Furthermore, the FTB’s subpoenas, deposition notices, and investigations are made outside of the SBE and do not have and do not need SBE

approval. The FTB is therefore able to continue to introduce new issues and new evidence and take new positions against Hyatt and is seeking to re-brief issues that had been previously briefed.

27. Due to the presumption of correctness under the California law underlying the FTB's determination and tax assessments, any residency evidence presented or briefing submitted by the FTB in the administrative appeal puts the burden on Hyatt, now more than 22 years after the fact, to rebut these alleged facts and arguments with credible evidence that is in many cases no longer available or accessible. The FTB is thereby able to make self-serving claims which are presumed by the SBE to be correct, and Hyatt has to attempt to obtain credible evidence on 22 year old events to rebut the FTB's presumption of correctness.

28. The FTB has every incentive to delay the administrative process to benefit itself. Indeed, the longer the delay the more it potentially benefits the FTB and irreparably prejudices Hyatt. The FTB attempts to use the presumption of correctness to assert new facts and take different positions against Hyatt over 20 years after the events at issue leaving Hyatt to have to seek evidence that no longer exists but is needed to overcome the FTB's grossly tardy assertions and presumption of correctness. The more new briefing the FTB is given by the SBE, the more the FTB can and does assert new facts and take different positions for which Hyatt must overcome the presumption of correctness, thereby escalating the deprivation of due process. A line has long since been crossed by the FTB and due process can no longer be had by Hyatt. A prime example is the FTB's new assessments for tens of millions of dollars in taxes, penalties, and interest in 2013 for the time period extending beyond the 1992 disputed period and the prejudice to Hyatt based upon the massive loss of documents and witness memories due to the passage of time.

29. The over 20 year campaign against Hyatt by the FTB is also unprecedented as the FTB has, in bad faith, singled him out as a "class of one" and

is intent on “getting him” and having him pay taxes for the 1991 and 1992 tax years, despite internal FTB documents from the time of the audits almost *20 years* ago which show key FTB personnel openly questioned the FTB's case against Hyatt. As described in more detail below in paragraphs 111 through 116 in Hyatt’s Second Claim for Relief under the Equal Protection Clause of the Fourteenth Amendment: (i) the lead FTB auditor openly stated that she was "going to get this [taxpayer]” referring to Hyatt; (ii) she made specific anti-Semitic remarks about Hyatt who is Jewish; (iii) she refused to document and instead “buried” exculpatory evidence in Hyatt’s favor; (iv) a more experienced FTB auditor familiar with the Hyatt audit file concluded that the lead auditor was obsessed with Hyatt and failed to obtain his side of the story, and this experienced FTB auditor complained internally to FTB management of the lead auditor’s conduct; (v) the FTB reviewer of the audits, and others at the FTB, expressed internal dissent regarding many of the lead auditor’s conclusions and expressed doubt as to the case against Hyatt, and (vi) the FTB nonetheless rubber-stamped the record setting assessments against Hyatt and used these assessments to justify its budget allocations for the state legislature. Accordingly, under a “class of one” doctrine, Hyatt is being denied equal protection under the law as alleged in his Second Claim for Relief.

30. The relief requested herein by Hyatt is not barred by the Eleventh Amendment of the U.S. Constitution because Hyatt seeks injunctive relief under Section 1983 against individual Defendants acting in their official capacities and who are depriving Hyatt of rights protected by the U.S. Constitution. The continuing deprivation of Hyatt’s constitutional rights has caused him irreparable harm.

31. The relief requested herein is not barred by the Tax Injunction Act (28 U.S.C. 1341) or by comity. Defendants, acting in their official capacities, have caused, and continue to cause, abject delays and have refused, and continue to

refuse, to conclude the investigation and administrative process that has been in progress for *over 20 years*, and has deprived Hyatt of a plain, speedy and efficient remedy in a state forum. In particular, Defendants' 20 year delay, and counting, in completing the administrative process far exceeds the typical and customary time for such process, and in fact is unprecedented, and thereby has resulted in the very antithesis of a speedy remedy. Defendants' 20 year delay, and counting, has also caused Hyatt undue hardship, required him to engage in ineffective activity and required him to expend unnecessary costs, time, and energy, and thereby has also resulted in the very antithesis of a plain and efficient remedy. Further, Hyatt has already been significantly harmed and prejudiced by the Defendants' abusive delays because, among other reasons, material witnesses have passed away, memories of witnesses have faded, and documents relevant and important to Hyatt are no longer available. Prior to this prejudice occurring, Hyatt could not pursue the statutory process in California state court that taxpayers are otherwise accorded by law (*see* Cal. Rev. & Tax Code § 19381; Cal. Civ. Proc. Code § 1060.5) because the FTB along with the SBE failed to conclude the ongoing 20 year administrative process. It is now too late and due process cannot be had in any such state court proceeding. Indeed, the law requires, and Hyatt or anyone in his position is entitled to, an exhaustion of the administrative process, including the still pending administrative appeal, at which time all of the taxpayer's positions are reviewed and considered before having to resort to state court for a *de novo* proceeding on the issue of whether taxes are owed.

32. While Hyatt could choose to forgo this administrative process by electing to pay the assessed taxes, penalties and interest to the FTB and file a refund claim, to do so he would have to (i) waive his statutory right to the administrative process, a process designed and intended to hear his version of events and his counter-arguments and thereby seek correction of FTB's errors and which if successful ends the tax assessment process against him and (ii) pay the very

assessments he contests and which have already been found by one court to have been made in bad faith by the FTB. Hyatt, or anyone in his position, is not required to voluntarily waive his statutory rights to administrative review simply because the process is taking too long. In fact, to suggest otherwise would create the perverse incentive for the FTB and the SBE to simply delay and delay the administrative process such that a taxpayer was required to waive his rights under that process and pay the assessment in order to go directly to state court to obtain review of the contested assessment before material evidence is lost when, as here, the FTB refused to complete the administrative process even after 20 plus years. That is neither the design nor intent of California law, nor would it be consistent with due process and equal protection as afforded by the United States Constitution. Unfortunately in this case, the FTB and the SBE have acted in a manner that deprived the law of accomplishing its purpose, resulting in Hyatt not having a plain, speedy and efficient remedy in a state forum. Hyatt's claim in this regard is not prospective, but rather he has already been irreparably prejudiced leaving him no plain, speedy and efficient remedy in state court. The Tax Injunction Act therefore does not apply, and Hyatt is entitled to the requested injunctive relief from this Court.

33. Accordingly, Defendants must now be enjoined from further violations of Hyatt's constitutional rights, from pursuing this investigation and administrative process and barred from making any assessment of taxes or attempted collection of taxes against Hyatt for the 1991 and 1992 tax years based on the "residency" and "sourcing" theories and any other theories asserted by the FTB against Hyatt in the administrative process.

## JURISDICTION AND VENUE

34. This action is based upon, and seeks to redress violations of 42 U.S.C. § 1983, the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, caused by Defendants acting under the color

of law, enforcing their practices, policies, customs, and usage of regulations adopted, employed and ratified by their supervisors. Accordingly, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 & 1343, in that this action arises under the Constitution and laws of the United States.

35. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise" to the claims in this civil action occurred within the territorial limits of this Judicial District. Moreover, Sacramento is where the Defendants perform their official duties, the place where they most frequently meet as a Board for the FTB and SBE, respectively, and the location from which directives, rules and regulations are issued to employees under their control and direction.

**FIRST CLAIM FOR RELIEF**

**(Violation and Continuing Violation of Hyatt's Due Process Rights Under the Fourteenth Amendment of the United States Constitution Warranting Injunctive Relief Under 42 U.S.C. § 1983 ─ against all Defendants)**

36. Hyatt realleges and incorporates by reference herein paragraphs 1 through 35 above.

37. Section 1 of the Fourteenth Amendment of the United States Constitution (the "Due Process Clause") provides that no State "shall deprive any person of life, liberty, or property, without due process of law."

38. The Due Process Clause requires that state officials provide individuals whose fundamental rights may be affected by state actions, including property rights, with a meaningful opportunity to be heard with respect to the governmental actions at issue.

## A. The 20 year (and counting) administrative process.

### *(i) The FTB's three year audit during which three different auditors worked the file (1993 to 1996).*

39. In April 1992, Hyatt filed a 1991 *part-year* California income tax return putting the FTB on notice that he had moved away from California in 1991. In 1993, shortly after an FTB employee read an article in a local Los Angeles newspaper describing Hyatt's purported receipt of a significant sum of patent royalty payments, the FTB notified Hyatt that he was under audit for his 1991 part-year California state income tax return. Three different auditors worked on the 1991 audit between 1993 and 1996, including the third and eventual lead auditor, discussed in more detail below. But it was the first auditor who candidly admitted under oath to the FTB's interest in Hyatt. This first auditor acknowledged that what "popped" into his mind in reading the article about Hyatt was how much money he had made, recalling that Hyatt stood to make "hundreds of millions" of additional dollars from his patents. This was long after Hyatt had moved away from California. This prompted the first auditor to request Hyatt's state tax return records and open an audit of Hyatt's 1991 tax-year return.

40. As the audit proceeded, none of the FTB auditors expressed any concern to Hyatt or his tax representatives regarding his 1991 *part-year* tax return. Two years later in August 1995, without warning or opportunity to address the assertions made against him, the FTB issued a lengthy Determination Letter informing Hyatt for the first time that the FTB intended to assess millions of dollars in taxes and penalties. For the first time the FTB asserted that Hyatt did not move to Nevada in September 1991, but rather asserted that he moved to Nevada in April 1992. A 75% penalty was assessed on the amount of assessed taxes for alleged fraud in regard to Hyatt's 1991 state income tax return.

41. In April 1996, the FTB issued its formal proposed assessment of taxes, penalties, and interest against Hyatt for the 1991 tax year then totaling

*$4,540,404.00*.

42. In June 1996, Hyatt filed a formal "protest" (an internal FTB appeal process) of the proposed assessment for the 1991 tax year, with a detailed refutation of the FTB's audit conclusions. The formal protest officially triggered what is described by the FTB and under California law as an internal review by the FTB's Protest Division which is supposed to consist of an independent arms-length fresh look at the audit.

43. Also in 1996, the FTB commenced a second tax audit of Hyatt, this one for the 1992 tax year. Later that year, without any additional investigation, the FTB informed Hyatt that it would assess him *more than six million* additional dollars in taxes and interest. A year later, in 1997, the FTB added a 75% fraud penalty for the 1992 tax year, increasing the total assessment against Hyatt by an additional *four million dollars*, not including interest.

44. In September 1997, the FTB issued its formal proposed assessment of taxes, penalties, and interest against Hyatt for the 1992 tax year then totaling *$14,115,941.00*. Hyatt filed a formal and timely protest of the 1992 tax-year proposed assessment, just as he had for the 1991 proposed assessment.

***(ii) The 11 year protest during which the FTB assigned at least four different protest officers (1996 to 2007).***

45. The FTB refused to conclude Hyatt's protests of the audit results for 11 years.

46. For the formal "protests" filed by Hyatt for both the 1991 and 1992 tax years in 1996 and 1997, respectively, the FTB was required by law and its own internal procedures to conduct an internal review by supposedly "independent" FTB employees, and if necessary, re-investigate the facts underlying each audit. Although Hyatt timely started the protest in 1996, the FTB dragged out the protest period *for over 11 years*. During the protest period, Hyatt's representatives repeatedly asked the FTB to bring the protest proceedings to a close, as Hyatt could

not proceed with a *de novo* administrative appeal to the SBE until the FTB's protest officer formally closed the protests and issued its final protest determination.

47. Between 1996 and 1998, the FTB's first protest officer was an FTB in-house attorney who had actually counseled with the FTB auditors during the audit and even re-wrote the fraud penalty narrative used by the FTB to assess Hyatt a fraud penalty. This protest officer was far from the "independent" FTB employee required to administer a protest. She admitted under sworn testimony that virtually no work was done relative to the protests for the two years that she was assigned to the protest. Hyatt's administrative protests simply were not processed during this time. The FTB blamed it on the rush of other matters.

48. In October 1998, the FTB replaced the first protest officer with a second protest officer. The second protest officer acknowledged under oath that he did virtually no work on the protests during the four months he was assigned to Hyatt's protest, blaming his workload on other matters as being too heavy.

49. From 1999 to May 2000, a third protest officer was assigned to Hyatt's protests. Unlike the first two protest officers, the third protest officer did start working on the protests. She submitted the first substantive request for additional information to Hyatt's tax attorney at the end of 1999, eight years after Hyatt moved to Nevada, consisting of a 40-page Information/Document Request (known as an "IDR").

50. The third protest officer testified under oath in another proceeding that she anticipated conducting a protest hearing relatively quickly and even sought to mediate the parties' differences, and was even open to *possibly dismissing the FTB's assessments* against Hyatt if her investigation warranted it.

51. But in May 2000, the third protest officer was abruptly removed by FTB management from further presiding over Hyatt's protests. She testified under oath that she was shocked and that she strongly disagreed with her supervisor's decision to remove her as protest officer. She was instructed *not to talk to or*

*transfer any records to* her replacement, the fourth protest officer. In turn, the fourth protest officer was considered a crony of or otherwise very "close" to the FTB protest division supervisor.

52. Thereafter in June of 2000, Hyatt responded to the FTB's IDRs, producing a substantial volume of material and answering dozens of interrogatories. In September and October of 2000, the fourth protest officer conducted separate formal hearings for the 1991 tax-year and 1992 tax-year protests. Following the hearings, additional IDRs were issued by the FTB and responded to by Hyatt. In June of 2001, Hyatt's tax attorney wrote to the fourth protest officer confirming that Hyatt has responded to all requests. This was not disputed by the fourth protest officer.

53. The fourth protest officer testified under oath, again in another proceeding, that she was ready to issue a decision on Hyatt's protests by the end of 2001. But 2001 came and went and no decision was issued.

54. In early 2002, with no decision having been issued by the FTB on the protests, Hyatt's tax attorney again inquired as to the status of a decision on the protests. Hyatt's tax attorney was informed that the protests were on "hold," even though the fourth protest officer had "written up" a decision on the protests and could have completed a final Determination Letter for the protests with a few weeks' notice in 2001.

55. E-mails and an internal FTB event log for the protests confirm that the FTB put Hyatt's protests on "hold." The fourth protest officer recorded in the FTB event log on February 20, 2002, "I told him [Hyatt's tax counsel] I was instructed not to work on the case." The FTB's highest ranking litigation counsel, wrote in an email on April 5, 2002, "I think we should put things on hold with administrative matters, in particular the recent draft letter." Almost a year later, the fourth protest officer wrote on February 20, 2003, "I am to do nothing on the case."

56. On November 1, 2007, *11 years after the protests commenced,* the

FTB finally issued its internal determination of the protests, rubber stamping the audit conclusions from 1995 and 1996, respectively, on the residency issue and finding that no changes would be made to the proposed assessments.

57. Indeed, the FTB went far beyond rubber stamping the audit results on the residency issue. In 2007, sixteen years after his move to Nevada, the FTB added an additional and new legal theory for investigating and assessing Hyatt, a legal theory premised on "sourcing" Hyatt's patent royalty income to California. The FTB auditors had not asserted a sourcing theory against Hyatt during the audits, and the FTB protest officers did not require briefing on or any other response from Hyatt regarding the "sourcing" theory for taxing Hyatt. In making the determination to assess Hyatt under a "sourcing" theory for the 1991 and 1992 tax years, the FTB accepted the fact that Hyatt *was not* a California resident during that disputed period, but rather was a resident of Nevada. Moreover, the FTB pursued the sourcing theory for assessing Hyatt despite the fact that an FTB team of experts, which included the lead auditor, had determined that the FTB could not tax Hyatt for "sourcing" and had reported this conclusion to top level FTB *management in 1995*.

58. In this regard, the FTB was so determined to tax Hyatt that it determined a basis to tax Hyatt *if he was* a California resident during the disputed period and a basis to tax Hyatt *if he was not* a California resident during the disputed period. The FTB, therefore, had effectively determined that whether or not Hyatt was a resident of California during the disputed period he must pay California tens of millions of dollars in state income taxes, penalties, and interest.

59. On December 26, 2007, the FTB issued to Hyatt final assessments called Notices of Action purportedly affirming the FTB's residency-based assessment for the 1991 tax year and the 1992 tax year. The Notice of Action for the 1991 tax year asserted residency-based liabilities against Hyatt (including accrued interest) in the amount of *$10,524,771.06*. The Notice of Action for the

1992 tax year asserted residency-based liabilities against Hyatt (including accrued interest) in the amount of *$29,088,458.29*. The Notices of Action also included as another basis for taxing Hyatt, a *non-residency* "sourcing" assessment for the same 1991 tax year and 1992 tax year. The FTB refused to take a definitive position as to whether Hyatt was a resident or a non-resident of California for the disputed period, instead the FTB held that Hyatt was a resident of California for a residency assessment of tens of millions of dollars and the FTB held that Hyatt was *not* a resident of California for a sourcing assessment of tens of millions of dollars for the same disputed period.

60. The FTB has also conveyed its intentions to assess new taxes for future tax periods, including threats during the administrative appeal as discussed further below to audit the years 1993, 1994, and 1995. But the FTB continues to hold this Sword of Damocles over Hyatt's head without making an assessment after much of his evidence for 1993, 1994, and 1995 is no longer available. The FTB contends that there is no statute of limitations for the 1992 tax year and thereafter because Hyatt has not filed a California state income tax return for 1992 or any year thereafter. The FTB therefore continues to investigate and introduce new issues regarding the 1992 tax year and beyond. Hyatt of course did not file tax returns for 1992 and beyond because he has been a Nevada resident since September of 1991, and even the FTB took the position early in the administrative process that Hyatt moved to Nevada by April 1992. Very recently, in 2013, the FTB has changed positions, assessing Hyatt tens of millions of dollars on income received after April 1992. This requires Hyatt to seek new evidence for the post-April 1992 period more than 20 years after that period of time.

***(iii) The continuing administrative appeal before the SBE for which there is no end in sight for the briefing and for which no hearing date has ever been set.***

61. On January 22, 2008, Hyatt exercised his right to appeal the FTB's determinations to the SBE. By law, the SBE must conduct a *de novo* administrative

review of the FTB's audit determinations, in which it accepts limited briefing by each party. Thereafter, the SBE conducts a hearing on the appeal. As described above, after this administrative appeal is completed and if the final decision rendered by the SBE is adverse to Hyatt, he may file a *de novo* action in California Superior Court for a determination of when he changed his residency and/or if any of his income was sourced to California, thereby challenging any adverse decision in the administrative appeal conducted by the SBE.

62. Hyatt's administrative appeal before the SBE has now been pending for over six years, and the SBE, through Defendants Yee, Runner, Steel, Horton, and Chiang, in their official capacities as Board Members of the SBE, have failed to render a decision, and, in fact, the SBE has failed to even set a schedule for a hearing. As a result of daily compounding interest caused by the FTB's and SBE's long and abusive delays, the combined total assessments of taxes, penalties, and interest against Hyatt exceed *$55 million*.

63. Indeed, the SBE is allowing continuing briefing. The open-ended and continuing nature of the FTB's investigations and of the SBE's proceeding not only violate the Constitution but also directly violate the FTB's and the SBE's own administrative rules and procedures including, for example, the SBE's rules of tax appeals ("RTA"), which set forth the "General Briefing Schedule" for appeals from FTB actions. Under RTA 5431(b) and (c), an appellant has a right to file an Opening Brief and a Reply Brief, while the FTB has only the right to file an Opening Brief. Yet, the SBE has far exceeded the agency's own internal rules governing administrative appeals. As detailed below, after the briefing was formerly closed by the SBE over a year ago, the FTB sought and was given leave to re-brief the appeal and to brief new evidence that it recently subpoenaed.

64. In regard to the briefing history, on December 9, 2008, Hyatt filed Opening Briefs before the SBE for each of the tax years 1991 and 1992, which were 95 pages and 75 pages, respectively, and accompanied by four boxes of

additional filings.

65. In correspondence to the SBE dated January 27, 2009, the FTB sought additional time for the filing of their Opening Briefs and cited as a basis for their request that the FTB "will need time to investigate the new alleged facts, which may require time for legal process." The FTB also cited specifically to 26 newly sworn affidavits (but failed to acknowledge that most of these affidavits came from witnesses who had been identified to the FTB in the administrative protests and thus the FTB had ample time during the protest phase to investigate such witnesses). The FTB then proceeded to issue subpoenas and take depositions of third party witnesses 18 years after Hyatt's move to Nevada.

66. On January 30, 2009, the FTB separately wrote to the SBE and asked for either a "postponement" of the SBE proceeding or for Hyatt's appeals to be "removed from the SBE's appeal calendar" and citing as a basis for their request that the FTB "will need time to investigate alleged facts, which may require time for legal process."

67. On February 6, 2009, the SBE denied the FTB's request for postponement and deferral and instead granted the FTB an additional three months (from March 9, 2009 to June 7, 2009) to file their Opening Briefs.

68. After requesting and receiving an additional extension, on September 15, 2009, the FTB filed their Opening Briefs for the 1991 and 1992 tax years, which were 100 pages and 75 pages, respectively, with two boxes of additional filings. The FTB also filed declarations of its private investigator regarding "*new*" interviews that it had been taking.

69. On August 23, 2010, Hyatt filed his Reply Briefs for each of the tax years 1991 and 1992, which were each 100 pages and with four boxes of additional filings. This was the conclusion of the SBE briefing as matter of right.

70. In correspondence dated August 26, 2010, the SBE notified the FTB that if they wished to request permission to file Reply Briefs, the FTB had until

September 10, 2010, to make such request. The SBE had discretionary authority whether to grant the FTB permission to file Reply Briefs and, not surprisingly, the SBE granted the FTB permission to file such Reply Briefs.

71. On September 1, 2010, the FTB did request permission to file Reply Briefs in the SBE Appeals, and requested a page limit not to exceed 100 pages for each brief and an extension of the filing date for such briefs beyond the 30 days provided by RTA 5431(c)( 2)(C) to June 30, 2011, a significant additional amount of time beyond the Reply Briefing schedule required under the SBE's own rules and procedures.

72. In their September 1, 2010 request, the FTB acknowledged that if the SBE granted the FTB's request to file a Reply Brief Hyatt would then be entitled under RTA 5431(c) to file Supplemental Briefs and expressed that it had no objection to Hyatt receiving from the SBE comparable time and page number allotments for such supplemental briefs.

73. In correspondence dated September 20, 2010, the SBE granted the FTB's request to file Reply Briefs with due dates of June 30, 2011.

74. On June 30, 2011, nearly ten months after the FTB's request for permission to file Reply Briefs in the SBE Appeals, the FTB filed their Reply Briefs for each of the tax years 1991 and 1992, which were each 100 pages and with two boxes of additional filings. The FTB also filed declarations of its private investigators regarding "*new*" investigations and interviews that the FTB had been surreptitiously conducting against Hyatt during the SBE appeal process.

75. On July 25, 2012, Hyatt filed his Supplemental Briefs, which he had the right to file under RTA 5431(c) given the SBE's extraordinary grant to the FTB for leave to file Reply Briefs in the SBE proceeding.

76. On August 8, 2012, the SBE issued a letter declaring that:

> Please note that ***briefing is completed*** for this appeal. ***We***

> ***will schedule the appeal for oral hearing*** and you will receive notice of the date and time of hearing at least 75 days in advance of the hearing date.

77. Notwithstanding the SBE's August 8, 2012, letter, a hearing has not been set. In a letter dated April 29, 2013, the FTB requested to re-brief Hyatt's previously filed evidence and to rebut Hyatt's prior briefings notwithstanding the fact that briefing in the proceeding had already been extended and notwithstanding that the SBE had closed briefing in the case in the correspondence issued by the SBE on August 8, 2012. It is understood that the FTB will re-brief the whole administrative appeal from the evidence in the Opening Briefs through the purported new evidence at issue in a New York court proceeding. The FTB's "additional briefing" is likely to be delayed at least another 18 months pending the result of the FTB's appeal in a New York court of a subpoena (the "New York Appeal") for which the FTB seeks, and was denied, new discovery of wide ranging documents well outside the disputed tax period at issue in Hyatt's appeal. When the FTB's additional briefing commences, this "additional briefing" is likely to take several more years given past rounds of briefing.

78. The FTB referenced in its SBE opening appeal briefs in 2009 that it may expand the audit against Hyatt to include the years 1993, 1994, and 1995. The FTB has never disclaimed this threat, nor has it taken any formal action to pursue an audit against Hyatt for those additional years. The FTB is apparently keeping its options open, particularly the option of expanding the time period for which it will seek to assess Hyatt decades after the tax years at issue. Again, this is the FTB's never ending administrative process to "get" Hyatt.

79. In sum, the California tax proceeding is far from over. But the California administrative delay has already unduly and irrevocably prejudiced Hyatt.

**B. Extreme prejudicial delay: the loss of witnesses, memories and documents over the last 22 years.**

80. The primary basis upon which the FTB asserts onerous taxes, interest and penalties are owed by Hyatt is that, the FTB contends, Hyatt moved to Nevada in April of 1992, while Hyatt contends he moved to Nevada in September of 1991 and has remained a resident of Nevada since that time (a residency theory). This six month disputed period ─ September 1991 to April 1992 ─ is the time-frame upon which the FTB is assessing Hyatt tens of millions of dollars in taxes, penalties and interest since commencing its audit in 1993. Again, the amount now sought by the FTB for this disputed six-month period is in excess of *$55 million*, mostly due to large interest components that continue to compound daily due to the FTB's and the SBE's long delays.

81. In 2007, as described above, more than 14 years after commencing its audit, for the first time, the FTB asserted an additional and a new legal theory, *i.e.*, California "source income," to tax Hyatt for his patent royalty income. This is a legal theory different from and incompatible with the FTB's residency theory. In this sourcing legal theory, the FTB regards Hyatt as a California *non-resident*. Thus, the FTB is assessing Hyatt both as a California resident and as a California non-resident for the same disputed period of time. The FTB contends that its assessments of tens of millions of taxes, penalties and interest against Hyatt should also be affirmed on this "sourcing" basis because Hyatt's patents had allegedly acquired a business *situs* in California and his alleged business activities in California continued through the disputed period. The amount sought by the FTB under this "sourcing" basis is also in excess of *$55 million*, also mostly composed of interest due to the long FTB delays.

82. By the FTB's own acknowledgement, California residency determinations, *i.e.*, determining the date upon which an individual moved from California to a different state and ceased being a resident of California, is a fact

intensive determination. Therefore, determining precisely when Hyatt moved to Nevada, more than 22 years ago, which ultimately is Hyatt's burden in a *de novo* action in California Superior Court, will require that Hyatt put forth witnesses and documentary evidence sufficient to establish the date of his residence in Nevada. But the FTB's now 20 year delay in completing the administrative process and appeal described above, by and through the Defendants acting in the official capacities for the FTB and SBE, respectively, has now prejudiced Hyatt with the inevitable loss of witnesses, loss of witness recollection and inability to find applicable documents due to the passage of time.

83. More than 100 witnesses have passed away or are not healthy enough or do not have clear memories to now provide competent testimony. These include individuals who would have been in a position to competently testify to facts relevant to Hyatt's move away from California or his residency in Nevada during the disputed period of September 1991 to April 1992 and/or to otherwise rebut the FTB's assertions regarding Hyatt's residency during the disputed period. Many of these witnesses have suffered severe medical problems including heart attacks, cancer, or Parkinson's disease, or have undergone severe medical procedures including open heart surgery, implanted pacemakers, radiation treatment, surgery, and in one case an implanted brain stimulation device. Hyatt is unduly prejudiced by not having these witnesses available in the ongoing administrative appeal or in any subsequent Superior Court action.

84. Another example of how Defendants have improperly used the passage of time against Hyatt is that during the audits the FTB requested from Hyatt information on his non-California professionals (*e.g.*, accountants, attorneys, and engineers) as use of these professionals is at least a factor in determining residency, and Hyatt provided in 1995 a list of 40 of his non-California professionals during 1991 and 1992. But the FTB disregarded this list and failed to contact the professionals on this list as part of its audit of Hyatt. Hyatt also provided an

additional list in 2001 and briefed the FTB on more than 100 of his non-California professionals, but the FTB similarly disregarded this list and failed to contact the professionals on this list at that time. Now, many of these non-California professionals are deceased, have poor health, cannot be located, or have faded memories.

85. A substantial amount of documents has been lost or destroyed because of the FTB's and the SBE's continuous and never-ending delays and the FTB's continual introduction of new positions. Moreover, it was not possible for Hyatt to know during the audits that he would have needed many or most of these documents because the FTB has continued to investigate and raise new issues. For example, in 2011, two decades after the tax year in dispute, the FTB first pursued production of documents known as the "Philips documents," which are at issue in the pending discovery dispute in a New York State Court. But other documentary evidence that would assist Hyatt to rebut, explain or address the Philips documents has been lost, destroyed, or is otherwise unavailable. In particular, all of the crucial documents of Mahr Leonard, a company engaged by Philips in its licensing program in the early 1990s and the entity that closed all of the licenses for Hyatt's patents during the disputed period, were destroyed in about 1999 pursuant to a document preservation program that has documents purged after a period of time.

86. A second example of the prejudicial impact to Hyatt of lost documents or otherwise unavailable documents is the evidence regarding alleged payments of $100,000 from Pioneer and $400,000 from Philips in 1991. The FTB disregarded Hyatt's disclosures on his 1991 tax return regarding his income from Pioneer and Philips in which Hyatt paid taxes on his income. Then, in 2007, 16 years after the tax year at issue, the FTB alleged that Hyatt underreported his income from Pioneer and Philips and committed fraud related to the alleged underreported income. By that time, evidence relative to the payments by Pioneer and Philips was no longer available to Hyatt.

87. A third example of lost or unavailable documents is the payment records on a promissory note from the sale of Hyatt's former California residence. During the audit, FTB did not request from Hyatt payment records on this promissory note. *But* in its 2009 briefing before the SBE, more than 16 years after it commenced its audit of Hyatt, the FTB alleged for the first time that Hyatt did not produce all the records of a third party regarding the payments on this note and that he committed fraud, in part, because of this alleged lack of evidence. Again, by 2009, this evidence regarding the payments on this note was no longer available.

88. A fourth example of lost documents is the files related to Hyatt's lease of an apartment at the Wagon Trails apartments in Las Vegas beginning in October of 1991. During the audit in 1995, the FTB contends that it was told by a Wagon Trails representative to obtain Hyatt's consent in order to obtain the renter's file on his apartment. But no action was taken by the FTB. In 1999 Hyatt first learned that the renter's file was no longer available. In its briefings to the SBE in 2009 and thereafter, the FTB relies heavily on documents that it alleges were in the renter's file but which no longer exist.

89. A fifth example of the prejudicial impact of lost or unavailable documents regards bank records from a former corporation operated by Hyatt. The FTB first raised the issue regarding these alleged missing bank records in its 2009 briefing before the SBE, more than 18 years after the corporation went inactive, and alleged that Hyatt committed fraud because the corporation's bank records were no longer available. However, the FTB did not request the corporation's bank records during the audits, despite the FTB being fully aware of the corporation as a result of its undisclosed investigation of the corporation.

90. A sixth example of the prejudicial impact of lost or unavailable documents regards documents related to the post April 1992 time period. After two decades of taking the consistent position that Hyatt was no longer a California resident after April 2, 1992 and not assessing Hyatt taxes for any period thereafter,

the FTB changed its position in 2013 to now assess tens of millions of dollars in taxes, penalties, and interest on Hyatt's income received after April 2, 1992, based on the sourcing theory. Obtaining evidence after more than 20 years regarding this post April 1992 time period is particularly difficult. For example, more than 50 Las Vegas businesses that Hyatt had contacts with during this period have either closed down or have not kept records going back 22 years to 1992. Furthermore, witnesses have died or do not remember what happened more than 20 years ago and witnesses no longer have records for this newly extended 1992 time period.

91. A seventh example of the prejudicial impact of lost or unavailable documents regards documents related to a fraud penalty — regarding abuse of corporate form — first asserted by the FTB in the final decision in the protests in 2007, 11 years after the close of the audits in 1996. The FTB's recent allegation is that Hyatt used corporate funds for personal expenses in the mid-1980s. To make this new allegation, the FTB misinterprets documents from the mid-1980s, almost 30 years ago. Corporate documents that would assist Hyatt in countering the FTB's new allegation based on the misinterpretation are unavailable, again almost 30 years after the fact. Moreover, this new allegation by the FTB has no relation to the fraud penalties in the 1991 and 1992 tax years for which the FTB audited Hyatt and which are still at issue in the pending administrative appeal. The only motive for the new allegation could be to again attempt to attack Hyatt and require him to spend precious time and resources rebutting misconstrued facts from almost 30 years ago to protect his credibility.

92. Instead of concluding the investigation and the administrative process, the FTB, by and through named Defendants Chiang, Horton, and Cohen, in their official capacities as FTB board members, as permitted by the SBE, by and through named Defendants Yee, Runner, Steel, Horton, and Chiang, in their official capacities as SBE board members, continue to investigate Hyatt and delay resolution of the 20 year administrative proceeding against Hyatt. Defendants'

refusal to complete the investigative and the administrative process, including the SBE proceeding described above, has exacerbated the prejudice to Hyatt resulting from the loss of witnesses, loss of witness recollections and the unavailability of material documents.

**C. Further irreparable prejudice to Hyatt due to the FTB's changes of position and assertion of new issues over the last 20 years.**

93. The FTB has significantly changed its positions and asserted new issues in its protest determination letter (November 1, 2007) and in its briefings before the SBE (2009 to the present). Because the FTB's positions have a presumption of correctness before the SBE, the FTB can change its position at will and Hyatt has the burden to prove that each new FTB position and assertion is erroneous. Hyatt has been irreparably prejudiced by these FTB change of positions and assertion of new issues in the FTB protest determination letter and in its briefings before the SBE. Specifically, the FTB delayed many years before bringing up these change of positions and assertion of new issues, yet it now complains that Hyatt does not have evidence to rebut the FTB's "new" positions. The FTB, however, has virtually unlimited discovery power during the audit, the protest and even the administrative appeal before the SBE, including issuing third party subpoenas. The FTB has been aggressively using this discovery power even now during the SBE appeal, some 20 years after the audits commenced, to try and create a one-sided record. Hyatt therefore faces a near impossible burden to overcome the one-sided record. As a lay person, Hyatt has virtually no discovery power during the audit and protest and now in the SBE appeal. The FTB by delaying and further delaying the administrative process, while continuing to change its positions and assert new issues, is able to set forth its one-sided record that Hyatt cannot fairly rebut due to the passage of time and loss of rebuttal evidence.

94. One of the most obvious and egregious examples of the FTB's

changes of position and assertion of new issues in its briefings before the SBE is the "day by day" analysis and calendars presented in the FTB's Opening briefs filed with the SBE in 2009. In so doing, the FTB added hundreds of new allegations for the disputed residency period of September 1991 to April 1992, which have a presumption of correctness in the SBE appeal. These new allegations are adamantly disputed by Hyatt, but the evidence that rebuts these new FTB allegations is difficult and in many cases impossible to locate. It is just too late to litigate the truth and accuracy of these new FTB allegations, now 22 years after-the-fact. Hyatt is not only prejudiced by these new and grossly tardy allegations in the SBE appeal but also will be prejudiced in any future state court action.

95. Another example of an FTB change in position in briefs filed with the SBE that prejudices Hyatt in both the SBE appeal and any future state court action relates to the FTB's change of position regarding the sale of Hyatt's California home in 1991. In 1995 the lead FTB auditor determined during the audit that Hyatt had sold his California house on October 1, 1991, and did not request further evidence regarding the sale of the house. But now, *18 years* later, the FTB contends that Hyatt did not sell his California house, ever. Because material witnesses have passed away, witnesses' memories have faded, and documents have been lost, Hyatt is severely prejudiced in rebutting the FTB's new position regarding the sale of his California house.

96. Hyatt is similarly prejudiced in rebutting the FTB's recent newly asserted position regarding Hyatt's alleged California source income, *i.e.*, the FTB's new theory for taxing Hyatt. This is particularly difficult because Mahr Leonard, the company that did the licensing work for all of the patent license agreements that were entered into during the disputed six month period in 1991 and 1992, purged its licensing documents from that period in 1999 in accord with its document retention policy years before the FTB subpoenaed the Philips licensing document starting in 2011. The Mahr Leonard documents would likely counter and

rebut positions the FTB is now attempting to assert by use of the recently subpoenaed Philips documents. Thus, the FTB has benefited significantly from the long and never-ending delays in the proceeding before the SBE and from its continuous investigations while Hyatt has been irreparably prejudiced by the foregoing delays and investigations.

97. Moreover, as referenced above, the FTB is currently engaged in an effort to further delay the administrative appeal by attempting to obtain the more than 8,000 pages of documents from the Philips Corporation through a New York court proceeding and by requesting a new round of comprehensive briefings before the SBE. In 1993, shortly after the audit was commenced, Hyatt disclosed his relationship with the Philips corporation and the FTB was well aware of the Philips Corporation's involvement in the licensing of Hyatt's patents. But the FTB waited almost 20 years before it issued subpoenas to Philips for documents and depositions. By that time, other documentary evidence, in particular the Mahr Leonard documents described above, that would assist Hyatt to rebut, explain or address the licensing documents from the Philips Corporation had been lost or purged. Using this advantage, on September 14, 2012, more than 20 years after the disputed period, the FTB submitted a letter to the SBE with an attached chart listing hundreds of new allegations ostensibly based on the Philips documents subpoenaed in 2011. Hyatt therefore is again left with attempting to address and rebut new allegations 22 plus years after the fact but is prejudiced by other related documentary evidence no longer being available.

98. Further to this point, in 2011 and 2012, respectively, the FTB took the depositions of two former Philips employees questioning them regarding the Philips documents first subpoenaed in 2011. One witness answered under oath that he did not remember or did not recall over 100 times and that he did not know over 50 times. The other witness answered under oath that that he did not remember or did not recall over 500 times. Again, therefore, the severe delay has worked to the

FTB's great benefit, while severely prejudicing Hyatt.

99. As a fourth example, the FTB contends that many of the affidavits and declarations of Hyatt's witnesses submitted in the SBE appeal are not credible *because the witnesses were recalling events from a long time ago*. The FTB similarly contends that there is insufficient contemporaneous documentation of the events described by these witnesses in their affidavits and declarations, which describe events that occurred many years prior. But as detailed above, given the long delay and extreme passage of time much of the documentation Hyatt sought during the SBE appeals is no longer available. And it is the FTB that has caused the long delays in the investigative and administrative process against Hyatt, yet the FTB now relies on the significant passage of time caused by the FTB's extreme delays in order to attempt to discredit Hyatt's witnesses. Hyatt is therefore the one prejudiced by the loss of contemporaneous documentation. Again, the FTB benefits significantly from the long delay in the administrative process, its own changes of position, and its presumption of correctness, while Hyatt has been irreparably prejudiced by the long delay, the FTB's changes of position, and its presumption of correctness.

100. To be clear, the benefit to the FTB and prejudice to Hyatt from the FTB's assertion of new facts and changes of position during the long delay infects the *de novo* trial Hyatt is otherwise entitled to in a California Superior Court. The FTB can be expected to continue to change positions and assert new facts in the *de novo* California Superior Court proceeding. Hyatt then will be required to submit rebuttal evidence for such new positions stemming from 25 or possibly 30 years in the past. Thus, the irreparable prejudice to Hyatt caused by the delays will only be exacerbated in a *de novo* proceeding in the California Superior Court.

**D. Relief sought to remedy loss of due process resulting from 20 year plus delay.**

101. Defendants' failure and refusal, or even inability, for over *20 years* to

complete the investigation and administrative process directed at whether Hyatt owes the State of California income taxes for the 1991 and 1992 tax years, based on whether he was a resident of California for the disputed six month period from September 1991 to April 1992, has deprived Hyatt of his due process rights. Specifically, his right to a *de novo* adjudication of his residency in a declaratory relief action in the California Superior Court can no longer by fairly and fully presented to a California court because of the loss of evidence over the last 20 years.

102. Similarly, Defendants' failure and refusal, and/or inability to complete the investigation and administrative process based on its "sourcing" theory, directed at whether Hyatt's patents had allegedly acquired a business *situs* in California through alleged "substantial use and value" and alleged business activities in California, has also deprived Hyatt of his due process rights. Again, specifically, his right to a *de novo* adjudication of the FTB's sourcing claim through a refund relief action in the California Superior Court can no longer be fairly and fully presented to a California court because of the loss of evidence of the last 20 years.

103. In sum, now, *22 years* after the six month disputed period, and over *20 years* after the FTB commenced an audit of Hyatt directed at determining his residency for that six month disputed period, too much supporting documentary evidence has been lost and too many supporting material witnesses are no longer available to Hyatt. This irreparable prejudice prevents Hyatt from obtaining due process even if he is someday allowed to seek relief in a California court.

104. If Defendants had acted with even a modicum of efficiency in bringing the investigation to an end and completing the administrative proceeding within a reasonable time, something substantially less than two decades, Hyatt would have been able to present this missing evidence in a *de novo* California Superior Court action at which time his residency during the disputed period could have and would

have been adjudicated in a court proceeding. Without this evidence, Hyatt has been prejudiced in his ability to establish his residency from *22 years ago*. Defendants' conduct in refusing to act and complete the administrative process after more than *20 years* and continual changes in position has therefore resulted in an extreme case of prejudicial delay to Hyatt's great detriment.

105. The prejudicial delay resulting from Defendants' failure, refusal, and/or inability to conclude the administrative process against Hyatt after more than *20 years* will result in a violation of Hyatt's rights under the Due Process Clause if the Defendants, on behalf of the State of California, now or at any time in the future issue a final determination in the pending administrative appeals that is adverse to Hyatt. Hyatt's ability to pursue and obtain a favorable outcome in a *de novo* proceeding in California Superior Court as to his residency during the disputed period (as is his right under California law) has now *after more than 22 years* been materially diminished and therefore irreparably prejudiced by Defendants' delay, changes in position and new issues, and failure to conclude its investigation and administrative process over the last 20 years. For the State of California by and through the Defendant government actors to now assess and seek to collect from Hyatt taxes, penalties and interest for the 1991 and 1992 tax years after depriving Hyatt the ability to obtain a full and fair *de novo* adjudication of this issue in a California court is and would be an illegal taking of his property in violation of the Due Process Clause. The threat of this unconstitutional taking from Hyatt warrants the injunctive relief requested, and Hyatt has no adequate remedy at law.

106. Defendants' deprivations and threatened deprivations of Hyatt's rights secured by the Constitution and by the Due Process Clause were carried out and continue to be carried out 'under color of state law.'

107. Pursuant to 42 U.S.C. § 1983, Hyatt seeks equitable relief from the Court to enjoin Defendants, in their official capacities, from allowing the FTB to

continue to violate his due process rights under the Due Process Clause, specifically preventing Defendants, acting in their respective official capacities from continuing the investigation and administrative proceedings against Hyatt that seek to assess California state income taxes, or adjudicate the assessment and collection of California state income taxes, against Hyatt for the 1991 and 1992 tax years in light of the extreme case of prejudicial delay resulting from Defendants' conduct over the last 20 years. Hyatt therefore specifically seeks equitable relief from the Court to enjoin Defendants from continuing to assess or threaten to assess, or collect or threaten to collect, taxes, penalties and interest from Hyatt for the 1991 and 1992 tax years. The requested relief is not barred by the Tax Injunction Act as Hyatt has no plain, speedy, and efficient remedy in a state forum due to the irreparable prejudice he has suffered over the last 20 years that would deprive him of due process under the law if Defendants were to continue to assess and collect taxes, penalties and interest from Hyatt for the 1991 and 1992 tax years.

108. Without the Court's grant of the injunctive relief that Hyatt seeks, Hyatt will suffer irreversible and irreparable harm.

**SECOND CLAIM FOR RELIEF**

**(Violations of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution Resulting from Defendants' Hostile Animus and Ill Will Towards Hyatt, Defendants' Desire "to get" Hyatt, Defendants' Vindictive, Irrational and Wholly Arbitrary Actions Towards Hyatt, and Related Abusive and Differential Treatment by Defendants of Hyatt Warranting Injunctive Relief Under 42 U.S.C. § 1983 ─ against all Defendants)**

109. Hyatt realleges and incorporates by reference herein paragraphs 1 through 108 above.

110. The FTB, by and through named Defendants Chiang, Horton, and

Cohen, in their official capacities as FTB board members, acting under the color of law and in violation of 42 U.S.C. § 1983, have violated Hyatt's rights to equal protection by knowing or they should have known of the intentional and bad faith conduct of FTB personnel who have singled out Hyatt and sought to "get him," but have allowed FTB personnel to continue this conduct and failed to allow a full, fair, and timely adjudication of whether Hyatt owes any taxes, penalties or interest to the State of California for the 1991 and 1992 tax years. Similarly, the SBE, by and through named Defendants Yee, Runner, Steel, Horton, and Chiang, in their official capacities as SBE board members, have allowed the FTB to continue its actions by not concluding the pending administrative process and in particular not timely deciding the current administrative appeal.

**A. The FTB in bad faith set out "to get" Hyatt in pursuing the audits, singling him out and treating him like no one else.**

111. From the inception of the FTB's audit in 1993, Hyatt was the subject of repeated oppressive, fraudulent, tortious and unlawful conduct by FTB auditors. This fact has already been determined by a court of law and a judgment has been entered to this effect. Specifically, in January 1998, Hyatt filed a lawsuit against the FTB in Nevada in Clark County District Court. In his suit against the FTB, Hyatt demonstrated that the FTB committed numerous torts against him during the FTB's audit including fraud (*i.e.*, conducting a bad faith fraudulent audit and delaying the protest in bad faith for 11 years), invasion of privacy, intentional infliction of emotional distress, abuse of process, and breach of confidential relationship.

112. After a lengthy litigation process, including pretrial review of the case by both the United States Supreme Court, *Franchise Tax Board v. Hyatt*, 538 U.S. 488 (2003), and twice by the Nevada Supreme Court, and a four month trial conducted by the Nevada State District Court (the "Nevada tort case"), a large judgment was entered against the FTB and in favor of Hyatt in August 2008 in the

amount of $138 million in compensatory damages and $250 million in punitive damages. The judgment included a finding by the Nevada jury that the FTB acted with malice, fraud and oppression during its audit of Hyatt, as Hyatt specifically asserted in support of the request for punitive damages that the FTB had conducted the audits in bad faith and then delayed and refused to issue decisions in the administrative protests for 11 years in bad faith so as to not allow Hyatt to pursue a *de novo* administrative appeal before the SBE. The FTB has appealed this judgment to the Nevada Supreme Court, and a decision is pending on the FTB's appeal.

113. The misconduct engaged in by the FTB as presented at the trial in the Nevada tort case, and which forms at least in part the basis of his equal protection claims, includes the following:

- The lead FTB auditor talked openly about "getting this taxpayer," meaning Hyatt.
- The lead FTB auditor made a number of anti-Semitic remarks during the audit about Hyatt, who is Jewish, including referring to Hyatt as a "Jew bastard" while talking to another FTB auditor and joking with this other auditor that most of the large income taxpayers in California were Jewish.
- This other more experienced FTB auditor believed that the lead FTB auditor was obsessed with Hyatt and had created a "fiction" about him.
- The lead FTB auditor also made an unauthorized visit to Hyatt's Las Vegas home *after she had closed the 1991 tax-year audit*, where she took a picture of Hyatt's house as if it was a trophy of her having "gotten" the "Jew bastard."
- The lead FTB auditor also called Hyatt's ex-wife after the audit, to

boast to her that Hyatt had been "convicted."*

- The lead FTB auditor attended the United States Supreme Court oral argument in the Nevada tort case, paying her own way to the proceedings, yet she claimed she was not obsessed with Hyatt.
- From the outset of the audits, even before the lead FTB auditor's involvement, evidence demonstrated the FTB actively searched for ways to tax Hyatt, whether or not he continued to reside in California.
- The evidence demonstrated that FTB was not impartially gathering the facts to make a fair determination whether any tax is owed, rather viewed the audits as a means to collect money from Hyatt for the FTB because, as the first auditor confirmed, Hyatt had made so much money.
- In particular, the lead FTB auditor did not pursue, and she tried to bury evidence that was favorable to Hyatt's position that he had moved to Nevada in September 1991, such as:
    - ➢ The lead FTB auditor intentionally did not document exculpatory statements from neighbors, who point blank told her that Hyatt had moved to Nevada during the very time frame Hyatt claimed;
    - ➢ The lead FTB auditor did not pursue information from numerous witnesses in Nevada provided by Hyatt, including real estate agents, escrow officers, insurance agents, a home inspector, a security provider, and others that supported Hyatt's version of events;
    - ➢ The lead FTB auditor did not acquire important documents that would have resolved a significant disputed set of facts, but the FTB had a presumption of correctness and it was

Hyatt that had the burden of proof;

  - The lead FTB auditor ignored or discounted records that, under FTB policies, are considered significant indicia of residency, including Hyatt's Nevada voter's registration, Nevada driver's license, and Nevada insurance, each of which Hyatt obtained in 1991.

- Instead the audit results against Hyatt were based primarily on three unsworn statements from estranged relatives of Hyatt, who had lost in litigation against Hyatt or had supported the losing party against Hyatt, yet the lead FTB auditor accepted their mostly secondhand information without question and made it the focus of her audit determinations.
- The lead FTB auditor manufactured reasons and misstated evidence in order to assess a fraud penalty against Hyatt as a “bargaining chip” to be used to induce him into a settlement.
- There was open internal dissent within the FTB which questioned whether the FTB had a case against Hyatt, let alone clear and convincing evidence to support a fraud penalty, but the FTB let the audit results stand and assessed Hyatt millions of dollars in taxes, penalties and interest.
- Evidence demonstrated that the FTB was driven by assessments, not collections, such that its future budget allocations and auditor promotions were based on what they assessed (or over-assessed) regardless of whether the assessments were ever collected.
- After the audits, and at the start of the “protests” that required the FTB to conduct an independent review of the audit results, the first FTB protest officer informed Hyatt’s tax counsel that if Hyatt did not settle the matter he would be subjected to an even more

intrusive and lengthy investigation and infringement on his privacy.

- Then Hyatt was subjected to an *11 year* protest process as described above and again below, with the threatened even more intrusive and lengthy investigation and infringement on his privacy, which the FTB ended only on the eve of the jury trial in the Nevada tort case described above.

114. This conduct by the FTB that was directed at Hyatt was specific to him and singled him out in a manner in which the FTB sought to extract taxes and penalties from him, regardless of whether they were owed under the law. Indeed, as addressed above, the FTB now takes the additional position that Hyatt must pay taxes to California for the same six-month disputed period as a non-resident of California. Specifically, the FTB has taken the position since the audit in 1995 that Hyatt was a resident of California during the disputed period, and therefore the FTB contends that Hyatt owes tens of millions of dollars based on a residency assessment. But the FTB now also contends that Hyatt was a non-resident of California during the same disputed period and that he owes tens of millions of dollars based on a "sourcing" assessment. The FTB's position towards Hyatt is therefore "heads the FTB wins, and tales Hyatt loses." Either way, the FTB "gets" Hyatt.

115. Additionally, over the 20 years since the FTB commenced the audit for the 1991 tax year, including through the protest, and the pending administrative appeal before the SBE, the FTB has continuously changed the asserted factual basis for the fraud penalty that it still maintains against Hyatt. The FTB asserts new facts trying to find new support for the fraud penalty when its assertions are rebutted or disproven. Indeed, the facts that the FTB is now relying on to continue to assert the fraud penalty, bear little resemblance to the facts that the FTB was relying upon when it first asserted the fraud penalty in 1995. The FTB is intent on not only

getting Hyatt, but asserting the maximum financial pressure on him through an unprecedented use of the fraud penalty.

**B. The FTB in bad faith delayed the protests for 11 years, singling Hyatt out and treating him like no one else.**

116. By 2005, *nine years into the protests*, the Nevada court in the Nevada tort case ruled that Hyatt could pursue discovery concerning the reason for the FTB's failure and refusal to issue a decision in the protests, and specifically whether the delay in concluding the protests supported Hyatt's claim that the FTB had acted in bad faith during the audits and whether the delay constituted continuing bad faith on the part of the FTB.

117. As alleged in paragraphs 45 to 60 above, discovery in the Nevada tort case uncovered the FTB's intentional "hold" on the protests from 2001 until 2007. This conduct by the FTB that was directed at Hyatt was specific to him and singled him out in a manner in which the FTB sought to extract taxes and penalties from him, regardless of whether they were owed under the law.

**C. The FTB's conduct is not rationally related to any legitimate state interest.**

118. The reason for Hyatt's differential treatment from the similarly-situated citizens under audit from the FTB was not rationally related to any legitimate state interest but, rather, was based upon the FTB's malicious, irrational and arbitrary intention to assess and collect taxes and penalties from Hyatt because he has made so much money, regardless of whether any taxes were owed by Hyatt under the law.

119. The Equal Protection Clause applies to state governmental action and restrains state government officials from differential treatment of an individual based upon the spiteful, vindictive and irrational motivations of the state government officials towards the individual. The purpose of the Equal Protection Clause is to protect every person subject to actions of state government officials

from arbitrary discrimination including intentional and hostile discriminatory actions carried out by a state's duly constituted agents. The Equal Protection Clause prohibits state governmental officials from intentionally or recklessly depriving individuals of their rights.

120. FTB's abusive and oppressive actions towards Hyatt for more than 20 years and the extensive record of the same demonstrate that the FTB has singled out Hyatt because of, in addition to other unconstitutional reasons, the FTB's ill will, hostile animus, and desire to "get" Hyatt. As described above, the FTB has carried out a vendetta for now 20 years seeking to "get" Hyatt because of his purported high net worth obtained after moving from California to Nevada, because he is Jewish, and because he had the temerity to refuse to settle with the FTB early during the protest process and not give up his rights under California law — despite FTB threats that a failure to settle would result in a more intrusive investigation into his finances, which the FTB then proceeded to engage in for the next 11 years.

121. The FTB's violations and continuing violations of the Equal Protection Clause, and the FTB's continuing threat to investigate Hyatt because of its hostile animus and ill will towards Hyatt, warrant the injunctive relief that Hyatt seeks, and Hyatt has no adequate remedy at law.

122. Pursuant to 42 U.S.C. § 1983, Hyatt seeks equitable relief from the Court to enjoin Defendants, in their official capacities, from allowing the FTB to continue to violate the equal protection rights of Hyatt under the Equal Protection Clause from continuing the investigation and administrative proceedings against Hyatt that seek to assess California state income taxes against Hyatt for the 1991 and 1992 tax years. Hyatt therefore specifically seeks equitable relief from the Court to enjoin the FTB from continuing to assess or threaten to assess, or collect or threaten to collect, taxes, penalties and interest for the 1991 and 1992 tax years. The requested relief is not barred by the Tax Injunction Act as Hyatt has no plain,

speedy, and efficient remedy in a state forum due to the irreparable prejudice he has suffered over the last 20 years that would deprive Hyatt of equal protection under the law if Defendants were to continue to assess or collect taxes, penalties and interest for the 1991 and 1992 tax years.

123. Without the Court's grant of the injunctive relief that Hyatt seeks, Hyatt will suffer irreversible and irreparable harm.

**WHEREFORE,** Hyatt prays for judgment as follows:

1. For a permanent injunction forbidding Defendants as members of the FTB and SBE from continuing the investigation and administrative proceedings against Hyatt that seek to assess California state income taxes, penalties or interest or adjudicate the assessment of California state income taxes, penalties or interest against Hyatt for the 1991 and 1992 tax years, or any subsequent years based on the same claims and the assertions the FTB has made in the current pending administrative proceeding;

2. For a permanent injunction forbidding Defendants as members of the FTB and SBE from continuing to assess or threaten to assess Hyatt, or collect or threaten to collect from Hyatt, taxes, penalties or interest for the 1991 and 1992 tax years, or any subsequent years based on the same claims and the assertions the FTB has made in the current pending administrative proceeding;

3. For attorneys' fees and costs in accord with Section 1983;

4. For such other and further relief as the Court deems just and proper.

DATED: April 4 , 2014

**PERKINS COIE LLP**

By:/s/ Donald J. Kula

Donald J. Kula

**ERWIN CHEMERINSKY, Esq.**

**SEGAL & ASSOCIATES, PC.**

Attorneys for Plaintiff
Gilbert P. Hyatt